J-S48017-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: E.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: N.R. | No. 586 MDA 2014 |

Appeal from the Decree entered February 26, 2014,
in the Court of Common Pleas of Northumberland County,
Orphans' Court, at No(s): 45 of 2013

| | |
|---|---|
| IN RE: ADOPTION OF: A.R. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: N.R. | No. 587 MDA 2014 |

Appeal from the Decree entered February 26, 2014,
in the Court of Common Pleas of Northumberland County,
Orphans' Court, at No(s): 46-2013

| | |
|---|---|
| IN RE: ADOPTION OF: I.R. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: N.R. | No. 588 MDA 2014 |

Appeal from the Decree entered February 26, 2014,
in the Court of Common Pleas of Northumberland County,
Orphans' Court, at No(s): 47-2013

| | |
|---|---|
| IN RE: ADOPTION OF: A.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: N.R. | No. 589 MDA 2014 |

Appeal from the Decree entered February 26, 2014,
in the Court of Common Pleas of Northumberland County,
Orphans' Court, at No(s): 48-2013

BEFORE:     DONOHUE, JENKINS, and PLATT*, JJ.

---

* Retired Senior Judge assigned to Superior Court.

J-S48017-14

MEMORANDUM BY JENKINS, J.:                    **FILED JANUARY 23, 2015**

Appellant, N.R. ("Father"), appeals from the decrees involuntarily terminating Father's parental rights to A.M. (born in December of 2004), I.R. (born in May of 2007), A.R. (born in March of 2000), and E.R. (born in September of 2001) (collectively "the Children").[1]  We affirm.

This family became known to Northumberland County Children and Youth Services ("CYS") in April of 2007 after allegations of an unsupervised child wandering around the city of Sunbury.  After a safety plan was approved for the family, the case was closed.  In 2010, General Protective Services ("GPS") became involved with the family due to allegations of domestic violence, poor home conditions, and because the family was going to be evicted from their apartment.  After Mother made arrangements for new housing and doctor appointments for the Children, the case was closed.  In late 2010 and early 2011, GPS referrals were received alleging the family's lack of basic utilities, Mother's drug use, domestic violence, potential eviction, various unidentified individuals who visited the home, drug use, and truancy.  On February 18, 2011, Mother signed a Voluntary Entrustment Agreement, placing the Children in CYS's custody.  The Children were placed

---

[1] On February 27, 2014, the trial court entered its decrees terminating D.M.'s ("Mother") parental rights to the Children.  Mother is not a party to this appeal, but filed a separate appeal at docket nos. 639, 640, 641, 642 MDA 2014.

- 2 -

in the care of Paternal Grandparents. On March 23, 2011, the Children were adjudicated dependent.

On August 14, 2013, CYS filed petitions for the involuntary termination of Father's parental rights, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b). On February 21, 2014, the trial court held a hearing on the petitions. At the hearing, Jennifer Donmoyer, a family service worker for CYS; Sara Blair McIntyre, a CYS caseworker; Maternal Grandmother; Paternal Grandmother; and Father testified.

On February 27, 2014, the trial court entered its decrees terminating Father's parental rights to the Children. On March 27, 2014, Father filed his notices of appeal and concise statements of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). This Court consolidated the cases *sua sponte* on April 25, 2014.

Father raises the following issues for our review:

1. Whether the trial court erred in determining that Northumberland County Children and Youth Services (CYS) presented clear and convincing evidence that grounds for involuntary termination exist?

2. Whether the trial court erred in determining that the best interest of the Children would be served by terminating parental rights?

Father's Brief at 16.

Our standard of review regarding orders terminating parental rights is as follows:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005). In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid.

*Id.* at 806. We have previously stated:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003). Additionally, this Court "need only agree with [the trial court's] decision as to any one subsection in order to affirm the termination of parental rights." *In re*

**B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004).

In terminating Father's parental rights, the trial court relied upon Section 2511(a)(1), (2), (5), (8), and (b) which provide:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

We have conducted a careful review of the briefs of the parties, the relevant law, the certified record, and the thorough opinion of the Honorable William Harvey Wiest, dated April 29, 2014. We conclude that competent evidence supports the trial court's termination of Father's parental rights to the Children under Sections 2511(a)(1) and (b).

We note the trial court's decree does not specifically address Section 2511(b). However, the trial court's accompanying memorandum does address Section 2511(b). It is clear the trial court felt that the termination of Father's rights is in the best interest of the Children. To the extent evidence of a bond between Children and Father was before trial court, the

trial court did not abuse its discretion in discounting that bond due to Father's continued incarceration. ***See In re Adoption of S.P.***, 47 A.3d 817, 830-831 (Pa. 2012) (stating that trial courts must review the individual circumstances for every child to determine how a parent's incarceration will factor into an assessment of the child's best interests).

Accordingly, on the basis of the well-analyzed discussion in the trial court opinion dated April 29, 2014, we affirm the decrees terminating Father's parental rights to the Children under Sections 2511(a)(1), and (b), and adopt that opinion as this Court's own.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/23/2015

TCO S48017-14

Circulated 11/24/2014 02:06 PM

2014 APR 29 AM 9: 23

FILED/RECORDED
SUNBURY, PA

NORTH'D CO
REGISTER/RECORDER
CLK ORPHANS COURT

## OPINION BELOW

IN THE COURT OF COMMON PLEAS
OF NORTHUMBERLAND COUNTY, PA

IN RE: ADOPTION OF
        E.R. a minor child      :      ORPHAN'S COURT DIVISION

                                    :      ADOPTEE # 45 of 2013

OPINION PURSUANT TO Pa.R.A.P. 1925(a)

### Factual and Procedural Background

The family in the above-captioned case became involved with Northumberland County Children and Youth services in April of 2007, after allegations of an unsupervised child wandering around in the city of Sunbury. The matter was referred for a safety plan assessment, a plan was approved and the case was closed.

General Protective Services (GPS) became involved with the family again in 2010 responding to allegations of domestic violence, poor home conditions[1], and the possibility that the family would be evicted from their apartment. After the natural mother made new arrangements for a residence and successfully scheduled doctors' appointments for the children, the case was again closed.

More GPS referrals were received in late 2010 into early 2011 regarding the family's lack of basic utilities, natural mother's drug use, domestic violence, and potential eviction. There were also allegations of various unidentified individuals who frequented the home[2]. After investigation, the home was found to be without hot water and the natural mother admitted to having smoked marijuana. The family continued to remain involved with the GPS division of the Northumberland County Children and Youth Services, during their involvement through February 2011, the family struggled with domestic violence, truancy, lack of employment, danger of evictions, and related drug use. On February 18th 2011, the natural mother signed a Voluntary Entrustment Agreement, placing her children (including the above-captioned child) in

---

[1] Specifically, it was alleged that one minor child had several "flea bites."

[2] The Dependency petition in the case suggested that there were a "lot of 'Puerto Ricans' in an out of the home at all hours of the day and night."

27

1

the care and custody of Northumberland County Children and Youth Services who, in turn, placed the children in the home of the paternal grandparents, ▮▮▮▮ and T▮▮▮▮.

The child was adjudicated Dependent on March 23rd 2011. The child was placed in foster care by the Agency. However, the placement was actually in the kinship home of ▮▮▮▮ T▮▮▮▮ W/ K.

On June 23rd 2013, Northumberland County Children and Youth Services (the Agency) filed a Motion for a Finding of Aggravated Circumstances alleging aggravated circumstances against the natural mother in that, while her identity or whereabouts were known, she failed to maintain substantial and continuing contact with the child for a period of six months.

On July 17th 2013, the Court found by clear and convincing evidence that the aggravated circumstance alleged existed as against the natural mother. The Court further ordered that NO efforts at reunification between the child and the Natural Mother need be made.

Consistent throughout the review period, that is the time during which the children were in care, the parents maintained little progress and efforts. Natural father was incarcerated (and continues to be) during the entire time period in which his children were in the Agency's custody. During his time of incarceration, the Natural father provided no documentation of any services, programs, or activities he was engaged in or completed. He did communicate with the children through letters. Natural mother, while ordered to participate in parenting classes, find gainful employment, and obtain housing, was minimally compliant. During the early part of the case, Natural Mother had visitation with the children, but from approximately mid-Summer of 2012 until sometime in early spring of 2013, she had no contact with the Agency and, to the Court's knowledge, did not contact the children.

On August 14th 2013, the Agency filed a Petition to Involuntarily Terminate the Parental Rights of Natural Mother and Natural Father. The children had spent thirty-six (36) months in the care and custody of the Agency, albeit in the home of their paternal grandmother and grandfather.

---

[3] The Order of Adjudication and Disposition indicates that placement was in Foster Care. The initial permanency review order indicated "Foster Care – Kinship."

2

28

On January 16th 2014, the Natural Mother filed a motion requesting the Court to direct the Agency to make a referral for a homestudy through the Interstate Compact. The homestudy would presumably have been performed on the maternal grandmother, who resided in New York. The Court denied the same.

On February 21st 2014 at the Termination Proceeding, the Natural Mother moved, in open court and on the record, for the relief requested in the motion. The Court denied the same, holding that the matter was better raised in proceedings before Dependency Court.

During the period of time in which the children were in care, the Natural Father, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ was incarcerated. During his incarceration, he wrote several letters which were received and reviewed by the caseworkers at the Agency, the caseworkers testified that they had written him back concerning the children. The Agency provided him with a copy of the Child's Permanency Plan, and never received any indication that the Natural Father did not understand or questioned the plan. Natural Father did sign the same on February 16th 2012.

The caseworker testified that as of April 2011, Natural Father was not engaged in any services. However, as of April 2013, the Natural father was "taking as many classes that w[ere] offered at SCI-Dallas. Due to each facility being different, they do not – they do not have the same things in each prison." See Transcript of Proceedings, February 21st 2014, pg 14. While in prison, Natural Father had regular visitation with the children. The children were transported by their grandmother, the kinship-foster parent. Natural Father was "very appropriate" during visitation with the children. See Transcript of Proceedings on February 21st 2014, pg 26. He sent the children pictures and letters, and kept in regular contact with the children. In some lengthy discussion, the caseworker was cross examined on the availability of services for the Natural Father while he was incarcerated. Specifically:

"Q: All right. Without looking at any orders, you don't know what you can say what he was court ordered to do, to participate in. Is that a fair statement?

A: That is fair. And due to being incarcerated, like I said earlier, not each facility has the same things. And it's tough for us to even know what is in each one because it changes from place to place or even month to month. So I think that was, in turn, why it was not spelled out as specific and said that when he would be released, he would need to let us know

3

specifically when he was out to become active with the full plan of what he needed to do."

*See Transcript of Proceedings from February 21st 2014, pg 28-9.*

Natural Father's maximum sentence date was June 13th 2014. According to the caseworker, the Natural Father was up for parole several times in during the three years the children were in placement, he was denied each time. The caseworker testified that it was her belief that he was denied by virtue of his behavior in prison. During the letter correspondence between the Natural Father and the caseworker, the Natural Father communicated his desire to be there for his children and his strong desire that the children not be adopted. The caseworker testified that she received letters from the Natural Father approximately monthly. She also testified that during her supervision of the visitation between the Natural Father and the children, Natural Father was entirely appropriate with the children, and the children were excited to see their father. Natural Father would mail some minor artwork, portraits, and other small gifts and keepsakes to the children whenever he could acquire the same.

The Natural Mother suffered from issues pertaining to domestic disputes and consistent transiency. What appears to be most disturbing is that Natural Mother apparently disappeared for some time and was unreachable by the Agency. Mother maintained limited visitation with her children. Specifically, between August of 2011 and Christmas of 2012, Natural Mother had no visits with her children. Regarding Mother's transiency, she lived in several towns and cities in Pennsylvania, and then moved to New York and New Jersey all during the time period that the children were in care. Mother made a great case at the termination hearing on February 21st 2014 regarding the fitness and availability of maternal grandmother as a resource home for the children. During the time of her request, Mother lived with the maternal grandmother in New York. Apparently, Mother had requested that the Agency permit the children to live with her in New York several times prior to Court on February 21st 2014.

Throughout the three years in placement, the kinship-foster family has provided for the needs of the children. An example of the level of devotion to the continued permanence of the children, is the fact that at the onset of placement, the youngest child was significantly behind in his immunization records, the grandmother successfully got him up to date. In her testimony, the grandmother testified as follows:

4

30

A. Well, taking care of the four children, it requires 110 percent of me. So whether it's school, doctor's appointments, dentist appointment. Three of the children – well, four of them were in counseling. Three of them now remain in counseling, which is sometimes weekly, every other week. Numerous appointments, basketball game. We lost this one. But basketball games, events, activities. You know, to me, I can – that's a full-time job basically.

See _Transcript of Proceedings on February 21st 2014_, pg 57.

At another juncture in the case, the grandmother proffered testimony that was very indicative of the effects on ALL children of removal from the home.

Q:    ...what were they like when they first came to live with you three years ago?

A:    I – I think – I guess I would say they were a little afraid. They always kind of stayed together. Like they kind of needed each other. They was very interwoven with one another. They always kind of always kept a bag kind of packed not knowing what was going to happen and stuff and, you know, just always concerned about what's for dessert, what we're going to eat, you know, and different things like that.

So I think in the beginning, they might have been a little bit afraid, not sure. You know, but they felt happy to be with us because here and now we were getting things that were consistent and structure and attention, and – you know, so –

See _Transcript from Proceedings on February 21st 2014_, pg 58-9.

Of note, at the termination proceeding, the permanency caseworker testified as follows regarding the oldest child:

"A.R. was not very open with me, at that time. She was very upset about being in the foster care system. It took a while. She grew and opened up, and now she's actually on a good working relationship with me to a point where she'll discuss things. She is very comfortable in the home. She's actually told me she has come to a means of understanding that they just need to find somewhere to be, and she's fine with everything that the agency has been trying to do for her." See _Transcript of Proceedings from February 21st 2014_, pg. 22.

5

31

The Agency had discerned that the kinship-foster family was willing to be permanent resources for two of the four children, the daughter of the grandmother[4], was willing to be a permanent resource for two of the children. The kinship-foster family and the daughter's family lived a reasonable distance from each other, which would facilitate continued contact and interaction between the children and their siblings.

In discussion with the children regarding the suggested permanency options, the grandmother characterized their relative reactions:

A.   All different reactions. [A.R.] just wants to be finished with Children and Youth. Adopt me. Do whatever you got to do. I just want to be finished. [E.R.] pretty much goes along with [A.R.]. She has been the mother for them when there wasn't really wasn't a mother figure there. So [A.R.] kind of feels like the three boys are her children. And I try to tell her, I'm the mother. One queen in the castle. It would be me. So she – they listen to her because that's who they're accustomed to. So [E.R.] will do what [A.R.] kind of say. They've been trained that way.

Whereas, the two younger ones – [A.M.] is pretty independent. He's excited. He wants to go with [grandmother's daughter]. He wants to be with her. [I.R.] is just totally different. He's a little bit – he's not sure. They said we're going to mommy, they say we're going here, and he just kind of goes along with the crowd because of his age, I would say.

The grandmother testified that she believed that the children were "bonded" to the natural father, however, she testified that she believed that the children would not suffer irreparable harm from a severing of that bond.

The Court entered final orders of termination following the hearing, both parents appeal.

## Rule of Law

---

[4] The grandmother is actually the step-grandmother for the children, as she is married to the paternal grandfather. The step-grandmother's daughter (█████████) is the other permanent resource. She is not biological family, however, she has visited with the kinship-foster family at every holiday and the children are very familiar with the daughter's family. As such, it is this Court's opinion that the daughter's family is within the definition of a "kinship" placement.

6

32

The grounds for involuntary termination of parental rights are set forth in section 2511 of title 23 of the Pennsylvania Consolidated Statutes. Specifically sections (a)(1); (a)(2); (a)(5); and (a)(8) appear substantially as follows:

23 Pa.C.S.A. §2511(a)

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

See 23 Pa C.S.A. §2511.

Subsection (b) of the statute provides that: the court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

7

33

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

The term "needs and welfare" is a legal concept that "denotes certain minimum requirements that all children are entitled to—adequate housing, clothing, food and love." *In Re Coast*, 561 A.2d 762, 770 (Pa Super. 1989); *In re Adoption of Michael J.C.*, 473 A.2d 1021, 1029 (Pa. Super. 1984). "Thus, needs and welfare has both a tangible dimension, food, clothing and shelter, and an intangible dimension, parental love." *In re P.A.B.*, 570 A.2d 522, 525 (Pa. Super 1990); *In re J.W.*, 578 A.2d 952, 957 (Pa. Super. 1990). "It is universally agreed that the bond of *539 parental affection is unique and irreplaceable. When parents act in accordance with the natural bonds of parental affection, preservation of the parent-child bond is *prima-facie* in the best interest of the child and the state has no justification to terminate that bond." *In re J.W.*, 578 A.2d at 958. "If, as here, ties with natural parents are present and are an active force in the child's life, then needs and welfare becomes a concept that argues against termination, rather than fosters it." *In re P.A.B.*, 570 A.2d at 525. Moreover, pursuant to section 2511(a)(5), a court "must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial." *Id.*

Subsection (a)(8) sets a 12-month time frame for a parent to remedy the conditions which led to placement. Once the twelve month period has been established, the court must next determine whether the conditions which led to the child's placement continue to exist, despite the reasonable and good faith efforts of the Agency, supplied over a realistic timeframe. In order to terminate under section 2511(a)(8), the Court is not required to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of potential services. *See In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008). The Superior Court provided a detailed analysis of the termination ground listed at 23 Pa. C.S.A. §2511(a)(8) in the recent case of *In re T.M.T.*, 64 A.3d 1119 (Pa. Super. 2013).

The Supreme Court of Pennsylvania has held that incarceration, while not a litmus test, can be determinative in a termination proceeding. *See In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012). Each termination of parental rights case involving an incarcerated parent must be

8

34

evaluated on its own facts, bearing in mind that the child's needs for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what he is supposed to do in prison. *See In re E.A.P.*, 944 A.2d 79 (Pa. Super. 2008). Incarceration does not relieve a parent of the duty to exercise reasonable firmness in maintaining a secure bond with the child. *In the Interest of A.P.*, 693 A.2d 240 (Pa. Super. 1997). In termination of parental rights cases involving an incarcerated parent, a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment; moreover, the parent wishing to reestablish her parental responsibilities bears the burden of proof relative to post-abandonment contact. *See In re C.L.G.*, 956 A.2d 999 (Pa. Super. 2008). When a parent is incarcerated, the focus in termination of parental rights action is on whether the parent utilized resources available while in prison to maintain a relationship with his child. *In re B.N.M.*, 856 A.2d 847 (Pa. Super. 2004).

In a case where the incarcerated parent wrote letters, forwarded some child support, and sent gifts to the child, the Court found that these actions did not indicate a serious intent to re-cultivate a parent-child relationship and a willingness and capacity to undertake a parental role, and thus termination was appropriate. *See e.g. In re D.J.S.*, 737 A.2d 283 (Pa. Super. 1999). The Court also found that the natural father in that case failed to utilize given resources and to take an affirmative approach to fulfill his parental duties and failed to follow through on inquires with prison officials and county social workers. *See Id.*

### Discussion:

As to Natural Father the decision reached has not been done so lightly. Natural Father indicates a willingness and a desire to reunify with his children. In addition, his children express a desire to reunify with him. He is appropriate with them during visits, and consistently strives to be a presence in their lives despite his incarceration. The caseworker testified that he does "everything he can" while incarcerated. Clearly we have a father who is striving to be a parent, despite being noticeably absent from the lives of his children.

However, Father has been incarcerated for over three years. His maximum sentence date is June 2014. He was not granted parole despite his requests and application for it. As noted above, the Court will not put a child's life on hold and await a parent who is fit, willing, and

9

35

able. Father would most likely not be fit and willing to provide care and control upon his release. As this Court is very familiar with the process by which released ex-convicts attempt to re-integrate and the hardships associated therewith, this Court is unwilling to force the children to wait any longer. Father is entirely appropriate with them, and it is likely that he loves them greatly, as they do him. However, this Court is encouraged by the prospect of adoption by the paternal grandfather and his step-daughter of the children. This kinship permanent placement will permit, albeit on Father's initiative only, continued contact between the children and their natural father. The fact that the words "termination" and "adoption" imply permanence and suggest a severance from a relationship with a natural parent has little effect in this case. This Court will not turn a blind eye to the practical considerations of the children's age and the fact that they acknowledge and love their father. There will be continued contact with the Natural Father and the children, and it will likely occur without this Court's intervention. Knowing, as we do, that that will be an easier process as the children are placed with kin makes this Court's decision that much more bearable.

As to the Natural Mother, the Court found aggravated circumstances as to her lack of involvement during the dependency case. It is severely disheartening to associate this situation with an absence of over six (6) months. This Court cannot fathom the lack of a desire to contact the children during that time. It, coupled with the troubling transiency, causes this Court to find that termination would certainly suit the best interests of the children as to Natural Mother. In addition, by virtue of the finding of aggravated circumstances, the natural mother has satisfied the statutory provisions which allow for termination when: there has been no contact between the parent and the child for a period of six (6) months; the conditions which led to placement continue to exist (lack of permanent living arrangements) and the fact that Mother has exhibited little interest in parenting her children until the eleventh hour.

## Conclusion

This Court hereby concludes that termination of the parental rights of both the Natural Father and the Natural Mother as to the minor children is required by the statutory provisions governing the same and would, undoubtedly serve the children's best interests.

BY THE COURT:

4 - 28 - 14

_____
Wm. Harvey Wiest, Judge

10

36

IN RE: ADOPTION OF

      A.R. a minor child

                      :

ORPHAN'S COURT DIVISION

ADOPTEE # 46 of 2013

## OPINION PURSUANT TO Pa.R.A.P. 1925(a)

### Factual and Procedural Background

The family in the above-captioned case became involved with Northumberland County Children and Youth services in April of 2007, after allegations of an unsupervised child wandering around in the city of Sunbury. The matter was referred for a safety plan assessment, a plan was approved and the case was closed.

General Protective Services (GPS) became involved with the family again in 2010 responding to allegations of domestic violence, poor home conditions[1], and the possibility that the family would be evicted from their apartment. After the natural mother made new arrangements for a residence and successfully scheduled doctors' appointments for the children, the case was again closed.

More GPS referrals were received in late 2010 into early 2011 regarding the family's lack of basic utilities, natural mother's drug use, domestic violence, and potential eviction. There were also allegations of various unidentified individuals who frequented the home[2]. After investigation, the home was found to be without hot water and the natural mother admitted to having smoked marijuana. The family continued to remain involved with the GPS division of the Northumberland County Children and Youth Services, during their involvement through February 2011, the family struggled with domestic violence, truancy, lack of employment, danger of evictions, and related drug use. On February 18th 2011, the natural mother signed a Voluntary Entrustment Agreement, placing her children (including the above-captioned child) in

---

[1] Specifically, it was alleged that one minor child had several "flea bites."

[2] The Dependency petition in the case suggested that there were a "lot of 'Puerto Ricans' in an out of the home at all hours of the day and night."

1

the care and custody of Northumberland County Children and Youth Services who, in turn, placed the children in the home of the paternal grandparents, William and Theolo Rivera.

The child was adjudicated Dependent on March 23rd 2011. The child was placed in foster care by the Agency. However, the placement was actually in the kinship home of ▀▀▀ WTR T▀▀▀▀▀[3].

On June 23rd 2013, Northumberland County Children and Youth Services (the Agency) filed a Motion for a Finding of Aggravated Circumstances alleging aggravated circumstances against the natural mother in that, while her identity or whereabouts were known, she failed to maintain substantial and continuing contact with the child for a period of six months.

On July 17th 2013, the Court found by clear and convincing evidence that the aggravated circumstance alleged existed as against the natural mother. The Court further ordered that NO efforts at reunification between the child and the Natural Mother need be made.

Consistent throughout the review period, that is the time during which the children were in care, the parents maintained little progress and efforts. Natural father was incarcerated (and continues to be) during the entire time period in which his children were in the Agency's custody. During his time of incarceration, the Natural father provided no documentation of any services, programs, or activities he was engaged in or completed. He did communicate with the children through letters. Natural mother, while ordered to participate in parenting classes, find gainful employment, and obtain housing, was minimally compliant. During the early part of the case, Natural Mother had visitation with the children, but from approximately mid-Summer of 2012 until sometime in early spring of 2013, she had no contact with the Agency and, to the Court's knowledge, did not contact the children.

On August 14th 2013, the Agency filed a Petition to Involuntarily Terminate the Parental Rights of Natural Mother and Natural Father. The children had spent thirty-six (36) months in the care and custody of the Agency, albeit in the home of their paternal grandmother and grandfather.

---

[3] The Order of Adjudication and Disposition indicates that placement was in Foster Care. The initial permanency review order indicated "Foster Care – Kinship."

2

On January 16th 2014, the Natural Mother filed a motion requesting the Court to direct the Agency to make a referral for a homestudy through the Interstate Compact. The homestudy would presumably have been performed on the maternal grandmother, who resided in New York. The Court denied the same.

On February 21st 2014 at the Termination Proceeding, the Natural Mother moved, in open court and on the record, for the relief requested in the motion. The Court denied the same, holding that the matter was better raised in proceedings before Dependency Court.

During the period of time in which the children were in care, the Natural Father, Nicolas Rivera, was incarcerated. During his incarceration, he wrote several letters which were received and reviewed by the caseworkers at the Agency, the caseworkers testified that they had written him back concerning the children. The Agency provided him with a copy of the Child's Permanency Plan, and never received any indication that the Natural Father did not understand or questioned the plan. Natural Father did sign the same on February 16th 2012.

The caseworker testified that as of April 2011, Natural Father was not engaged in any services. However, as of April 2013, the Natural father was "taking as many classes that w[ere] offered at SCI-Dallas. Due to each facility being different, they do not – they do not have the same things in each prison." See Transcript of Proceedings, February 21st 2014, pg 14. While in prison, Natural Father had regular visitation with the children. The children were transported by their grandmother, the kinship-foster parent. Natural Father was "very appropriate" during visitation with the children. See Transcript of Proceedings on February 21st 2014, pg 26. He sent the children pictures and letters, and kept in regular contact with the children. In some lengthy discussion, the caseworker was cross examined on the availability of services for the Natural Father while he was incarcerated. Specifically:

"Q:    All right. Without looking at any orders, you don't know what you can say what he was court ordered to do, to participate in. Is that a fair statement?

A:    That is fair. And due to being incarcerated, like I said earlier, not each facility has the same things. And it's tough for us to even know what is in each one because it changes from place to place or even month to month. So I think that was, in turn, why it was not spelled out as specific and said that when he would be released, he would need to let us know

3

39

specifically when he was out to become active with the full plan of what he needed to do."

*See Transcript of Proceedings from February 21st 2014*, pg 28-9.

Natural Father's maximum sentence date was June 13th 2014. According to the caseworker, the Natural Father was up for parole several times in during the three years the children were in placement, he was denied each time. The caseworker testified that it was her belief that he was denied by virtue of his behavior in prison. During the letter correspondence between the Natural Father and the caseworker, the Natural Father communicated his desire to be there for his children and his strong desire that the children not be adopted. The caseworker testified that she received letters from the Natural Father approximately monthly. She also testified that during her supervision of the visitation between the Natural Father and the children, Natural Father was entirely appropriate with the children, and the children were excited to see their father. Natural Father would mail some minor artwork, portraits, and other small gifts and keepsakes to the children whenever he could acquire the same.

The Natural Mother suffered from issues pertaining to domestic disputes and consistent transiency. What appears to be most disturbing is that Natural Mother apparently disappeared for some time and was unreachable by the Agency. Mother maintained limited visitation with her children. Specifically, between August of 2011 and Christmas of 2012, Natural Mother had no visits with her children. Regarding Mother's transiency, she lived in several towns and cities in Pennsylvania, and then moved to New York and New Jersey all during the time period that the children were in care. Mother made a great case at the termination hearing on February 21st 2014 regarding the fitness and availability of maternal grandmother as a resource home for the children. During the time of her request, Mother lived with the maternal grandmother in New York. Apparently, Mother had requested that the Agency permit the children to live with her in New York several times prior to Court on February 21st 2014.

Throughout the three years in placement, the kinship-foster family has provided for the needs of the children. An example of the level of devotion to the continued permanence of the children, is the fact that at the onset of placement, the youngest child was significantly behind in his immunization records, the grandmother successfully got him up to date. In her testimony, the grandmother testified as follows:

4

40

A. Well, taking care of the four children, it requires 110 percent of me. So whether it's school, doctor's appointments, dentist appointment. Three of the children – well, four of them were in counseling. Three of them now remain in counseling, which is sometimes weekly, every other week. Numerous appointments, basketball game. We lost this one. But basketball games, events, activities. You know, to me, I can – that's a full-time job basically.

See *Transcript of Proceedings on February 21ˢᵗ 2014*, pg 57.

At another juncture in the case, the grandmother proffered testimony that was very indicative of the effects on ALL children of removal from the home.

Q:   ...what were they like when they first came to live with you three years ago?

A:   I – I think – I guess I would say they were a little afraid. They always kind of stayed together. Like they kind of needed each other. They was very interwoven with one another. They always kind of always kept a bag kind of packed not knowing what was going to happen and stuff and, you know, just always concerned about what's for dessert, what we're going to eat, you know, and different things like that.

So I think in the beginning, they might have been a little bit afraid, not sure. You know, but they felt happy to be with us because here and now we were getting things that were consistent and structure and attention, and – you know, so –

See *Transcript from Proceedings on February 21ˢᵗ 2014*, pg 58-9.

Of note, at the termination proceeding, the permanency caseworker testified as follows regarding the oldest child:

"A.R. was not very open with me, at that time. She was very upset about being in the foster care system. It took a while. She grew and opened up, and now she's actually on a good working relationship with me to a point where she'll discuss things. She is very comfortable in the home. She's actually told me she has come to a means of understanding that they just need to find somewhere to be, and she's fine with everything that the agency has been trying to do for her." *See Transcript of Proceedings from February 21ˢᵗ 2014*, pg. 22.

5

41

The Agency had discerned that the kinship-foster family was willing to be permanent resources for two of the four children, the daughter of the grandmother[4], was willing to be a permanent resource for two of the children. The kinship-foster family and the daughter's family lived a reasonable distance from each other, which would facilitate continued contact and interaction between the children and their siblings.

In discussion with the children regarding the suggested permanency options, the grandmother characterized their relative reactions:

A.  All different reactions. [A.R.] just wants to be finished with Children and Youth. Adopt me. Do whatever you got to do. I just want to be finished. [E.R.] pretty much goes along with [A.R.]. She has been the mother for them when there wasn't really wasn't a mother figure there. So [A.R.] kind of feels like the three boys are her children. And I try to tell her, I'm the mother. One queen in the castle. It would be me. So she – they listen to her because that's who they're accustomed to. So [E.R.] will do what [A.R.] kind of say. They've been trained that way.

Whereas, the two younger ones – [A.M.] is pretty independent. He's excited. He wants to go with [grandmother's daughter]. He wants to be with her. [I.R.] is just totally different. He's a little bit – he's not sure. They said we're going to mommy, they say we're going here, and he just kind of goes along with the crowd because of his age, I would say.

The grandmother testified that she believed that the children were "bonded" to the natural father, however, she testified that she believed that the children would not suffer irreparable harm from a severing of that bond.

The Court entered final orders of termination following the hearing, both parents appeal.

## Rule of Law

---

[4] The grandmother is actually the step-grandmother for the children, as she is married to the paternal grandfather. The step-grandmother's daughter (█████████) is the other permanent resource. She is not biological family, however, she has visited with the kinship-foster family at every holiday and the children are very familiar with the daughter's family. As such, it is this Court's opinion that the daughter's family is within the definition of a "kinship" placement.

6

42

The grounds for involuntary termination of parental rights are set forth in section 2511 of title 23 of the Pennsylvania Consolidated Statutes. Specifically sections (a)(1); (a)(2); (a)(5); and (a)(8) appear substantially as follows:

23 Pa.C.S.A. §2511(a)

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

...

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

...

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

_See_ 23 Pa C.S.A. §2511.

Subsection (b) of the statute provides that: the court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

7

43

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

The term "needs and welfare" is a legal concept that "denotes certain minimum requirements that all children are entitled to—adequate housing, clothing, food and love." *In Re Coast,* 561 A.2d 762, 770 (Pa Super. 1989); *In re Adoption of Michael J.C.,* 473 A.2d 1021, 1029 (Pa. Super. 1984). "Thus, needs and welfare has both a tangible dimension, food, clothing and shelter, and an intangible dimension, parental love." *In re P.A.B.,* 570 A.2d 522, 525 (Pa. Super 1990); *In re J.W.,* 578 A.2d 952, 957 (Pa. Super. 1990). "It is universally agreed that the bond of *539 parental affection is unique and irreplaceable. When parents act in accordance with the natural bonds of parental affection, preservation of the parent-child bond is *prima-facie* in the best interest of the child and the state has no justification to terminate that bond." *In re J.W.,* 578 A.2d at 958. "If, as here, ties with natural parents are present and are an active force in the child's life, then needs and welfare becomes a concept that argues against termination, rather than fosters it." *In re P.A.B.,* 570 A.2d at 525. Moreover, pursuant to section 2511(a)(5), a court "must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial." *Id.*

Subsection (a)(8) sets a 12-month time frame for a parent to remedy the conditions which led to placement. Once the twelve month period has been established, the court must next determine whether the conditions which led to the child's placement continue to exist, despite the reasonable and good faith efforts of the Agency, supplied over a realistic timeframe. In order to terminate under section 2511(a)(8), the Court is not required to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of potential services. *See In re K.Z.S.,* 946 A.2d 753, 759 (Pa. Super. 2008). The Superior Court provided a detailed analysis of the termination ground listed at 23 Pa. C.S.A. §2511(a)(8) in the recent case of *In re T.M.T.,* 64 A.3d 1119 (Pa. Super. 2013).

The Supreme Court of Pennsylvania has held that incarceration, while not a litmus test, can be determinative in a termination proceeding. *See In re Adoption of S.P.,* 47 A.3d 817 (Pa. 2012). Each termination of parental rights case involving an incarcerated parent must be

8

44

evaluated on its own facts, bearing in mind that the child's needs for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what he is supposed to do in prison. *See In re E.A.P.*, 944 A.2d 79 (Pa. Super. 2008). Incarceration does not relieve a parent of the duty to exercise reasonable firmness in maintaining a secure bond with the child. *In the Interest of A.P.*, 693 A.2d 240 (Pa. Super. 1997). In termination of parental rights cases involving an incarcerated parent, a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment; moreover, the parent wishing to reestablish her parental responsibilities bears the burden of proof relative to post-abandonment contact. *See In re C.L.G.*, 956 A.2d 999 (Pa. Super. 2008). When a parent is incarcerated, the focus in termination of parental rights action is on whether the parent utilized resources available while in prison to maintain a relationship with his child. *In re B.N.M.*, 856 A.2d 847 (Pa. Super. 2004).

In a case where the incarcerated parent wrote letters, forwarded some child support, and sent gifts to the child, the Court found that these actions did not indicate a serious intent to re-cultivate a parent-child relationship and a willingness and capacity to undertake a parental role, and thus termination was appropriate. *See e.g. In re D.J.S.*, 737 A.2d 283 (Pa. Super. 1999). The Court also found that the natural father in that case failed to utilize given resources and to take an affirmative approach to fulfill his parental duties and failed to follow through on inquires with prison officials and county social workers. *See Id.*

### Discussion:

As to Natural Father the decision reached has not been done so lightly. Natural Father indicates a willingness and a desire to reunify with his children. In addition, his children express a desire to reunify with him. He is appropriate with them during visits, and consistently strives to be a presence in their lives despite his incarceration. The caseworker testified that he does "everything he can" while incarcerated. Clearly we have a father who is striving to be a parent, despite being noticeably absent from the lives of his children.

However, Father has been incarcerated for over three years. His maximum sentence date is June 2014. He was not granted parole despite his requests and application for it. As noted above, the Court will not put a child's life on hold and await a parent who is fit, willing, and

9

45

able. Father would most likely not be fit and willing to provide care and control upon his release. As this Court is very familiar with the process by which released ex-convicts attempt to re-integrate and the hardships associated therewith, this Court is unwilling to force the children to wait any longer. Father is entirely appropriate with them, and it is likely that he loves them greatly, as they do him. However, this Court is encouraged by the prospect of adoption by the paternal grandfather and his step-daughter of the children. This kinship permanent placement will permit, albeit on Father's initiative only, continued contact between the children and their natural father. The fact that the words "termination" and "adoption" imply permanence and suggest a severance from a relationship with a natural parent has little effect in this case. This Court will not turn a blind eye to the practical considerations of the children's age and the fact that they acknowledge and love their father. There will be continued contact with the Natural Father and the children, and it will likely occur without this Court's intervention. Knowing, as we do, that that will be an easier process as the children are placed with kin makes this Court's decision that much more bearable.

As to the Natural Mother, the Court found aggravated circumstances as to her lack of involvement during the dependency case. It is severely disheartening to associate this situation with an absence of over six (6) months. This Court cannot fathom the lack of a desire to contact the children during that time. It, coupled with the troubling transiency, causes this Court to find that termination would certainly suit the best interests of the children as to Natural Mother. In addition, by virtue of the finding of aggravated circumstances, the natural mother has satisfied the statutory provisions which allow for termination when: there has been no contact between the parent and the child for a period of six (6) months; the conditions which led to placement continue to exist (lack of permanent living arrangements) and the fact that Mother has exhibited little interest in parenting her children until the eleventh hour.

## Conclusion

This Court hereby concludes that termination of the parental rights of both the Natural Father and the Natural Mother as to the minor children is required by the statutory provisions governing the same and would, undoubtedly serve the children's best interests.

BY THE COURT:

4-28-14

Wm. Harvey Wiest, Judge

10

46

IN THE COURT OF COMMON PLEAS
OF NORTHUMBERLAND COUNTY, PA

IN RE: ADOPTION OF                    :

           I.R. a minor child      :       ORPHAN'S COURT DIVISION

                                         :       ADOPTEE # 47 of 2013

                                         :

OPINION PURSUANT TO Pa.R.A.P. 1925(a)

**Factual and Procedural Background**

The family in the above-captioned case became involved with Northumberland County Children and Youth services in April of 2007, after allegations of an unsupervised child wandering around in the city of Sunbury. The matter was referred for a safety plan assessment, a plan was approved and the case was closed.

General Protective Services (GPS) became involved with the family again in 2010 responding to allegations of domestic violence, poor home conditions[1], and the possibility that the family would be evicted from their apartment. After the natural mother made new arrangements for a residence and successfully scheduled doctors' appointments for the children, the case was again closed.

More GPS referrals were received in late 2010 into early 2011 regarding the family's lack of basic utilities, natural mother's drug use, domestic violence, and potential eviction. There were also allegations of various unidentified individuals who frequented the home[2]. After investigation, the home was found to be without hot water and the natural mother admitted to having smoked marijuana. The family continued to remain involved with the GPS division of the Northumberland County Children and Youth Services, during their involvement through February 2011, the family struggled with domestic violence, truancy, lack of employment, danger of evictions, and related drug use. On February 18th 2011, the natural mother signed a Voluntary Entrustment Agreement, placing her children (including the above-captioned child) in

---

[1] Specifically, it was alleged that one minor child had several "flea bites."

[2] The Dependency petition in the case suggested that there were a "lot of 'Puerto Ricans' in an out of the home at all hours of the day and night."

1

the care and custody of Northumberland County Children and Youth Services who, in turn, placed the children in the home of the paternal grandparents, W███ and T███ R███

The child was adjudicated Dependent on March 23rd 2011. The child was placed in foster care by the Agency. However, the placement was actually in the kinship home of ██████ ████████.[3] *WTR*

On June 23rd 2013, Northumberland County Children and Youth Services (the Agency) filed a Motion for a Finding of Aggravated Circumstances alleging aggravated circumstances against the natural mother in that, while her identity or whereabouts were known, she failed to maintain substantial and continuing contact with the child for a period of six months.

On July 17th 2013, the Court found by clear and convincing evidence that the aggravated circumstance alleged existed as against the natural mother. The Court further ordered that NO efforts at reunification between the child and the Natural Mother need be made.

Consistent throughout the review period, that is the time during which the children were in care, the parents maintained little progress and efforts. Natural father was incarcerated (and continues to be) during the entire time period in which his children were in the Agency's custody. During his time of incarceration, the Natural father provided no documentation of any services, programs, or activities he was engaged in or completed. He did communicate with the children through letters. Natural mother, while ordered to participate in parenting classes, find gainful employment, and obtain housing, was minimally compliant. During the early part of the case, Natural Mother had visitation with the children, but from approximately mid-Summer of 2012 until sometime in early spring of 2013, she had no contact with the Agency and, to the Court's knowledge, did not contact the children.

On August 14th 2013, the Agency filed a Petition to Involuntarily Terminate the Parental Rights of Natural Mother and Natural Father. The children had spent thirty-six (36) months in the care and custody of the Agency, albeit in the home of their paternal grandmother and grandfather.

---

[3] The Order of Adjudication and Disposition indicates that placement was in Foster Care. The Initial permanency review order indicated "Foster Care – Kinship."

2

On January 16th 2014, the Natural Mother filed a motion requesting the Court to direct the Agency to make a referral for a homestudy through the Interstate Compact. The homestudy would presumably have been performed on the maternal grandmother, who resided in New York. The Court denied the same.

On February 21st 2014 at the Termination Proceeding, the Natural Mother moved, in open court and on the record, for the relief requested in the motion. The Court denied the same, holding that the matter was better raised in proceedings before Dependency Court.

During the period of time in which the children were in care, the Natural Father, ██████ *NR* ██████ was incarcerated. During his incarceration, he wrote several letters which were received and reviewed by the caseworkers at the Agency, the caseworkers testified that they had written him back concerning the children. The Agency provided him with a copy of the Child's Permanency Plan, and never received any indication that the Natural Father did not understand or questioned the plan. Natural Father did sign the same on February 16th 2012.

The caseworker testified that as of April 2011, Natural Father was not engaged in any services. However, as of April 2013, the Natural father was "taking as many classes that w[ere] offered at SCI-Dallas. Due to each facility being different, they do not – they do not have the same things in each prison." See Transcript of Proceedings, February 21st 2014, pg 14. While in prison, Natural Father had regular visitation with the children. The children were transported by their grandmother, the kinship-foster parent. Natural Father was "very appropriate" during visitation with the children. See Transcript of Proceedings on February 21st 2014, pg 26. He sent the children pictures and letters, and kept in regular contact with the children. In some lengthy discussion, the caseworker was cross examined on the availability of services for the Natural Father while he was incarcerated. Specifically:

> "Q:     All right. Without looking at any orders, you don't know what you can say what he was court ordered to do, to participate in. Is that a fair statement?
>
> A:      That is fair. And due to being incarcerated, like I said earlier, not each facility has the same things. And it's tough for us to even know what is in each one because it changes from place to place or even month to month. So I think that was, in turn, why it was not spelled out as specific and said that when he would be released, he would need to let us know

3

49

specifically when he was out to become active with the full plan of what he needed to do."

See *Transcript of Proceedings from February 21st 2014*, pg 28-9.

Natural Father's maximum sentence date was June 13th 2014. According to the caseworker, the Natural Father was up for parole several times in during the three years the children were in placement, he was denied each time. The caseworker testified that it was her belief that he was denied by virtue of his behavior in prison. During the letter correspondence between the Natural Father and the caseworker, the Natural Father communicated his desire to be there for his children and his strong desire that the children not be adopted. The caseworker testified that she received letters from the Natural Father approximately monthly. She also testified that during her supervision of the visitation between the Natural Father and the children, Natural Father was entirely appropriate with the children, and the children were excited to see their father. Natural Father would mail some minor artwork, portraits, and other small gifts and keepsakes to the children whenever he could acquire the same.

The Natural Mother suffered from issues pertaining to domestic disputes and consistent transiency. What appears to be most disturbing is that Natural Mother apparently disappeared for some time and was unreachable by the Agency. Mother maintained limited visitation with her children. Specifically, between August of 2011 and Christmas of 2012, Natural Mother had no visits with her children. Regarding Mother's transiency, she lived in several towns and cities in Pennsylvania, and then moved to New York and New Jersey all during the time period that the children were in care. Mother made a great case at the termination hearing on February 21st 2014 regarding the fitness and availability of maternal grandmother as a resource home for the children. During the time of her request, Mother lived with the maternal grandmother in New York. Apparently, Mother had requested that the Agency permit the children to live with her in New York several times prior to Court on February 21st 2014.

Throughout the three years in placement, the kinship-foster family has provided for the needs of the children. An example of the level of devotion to the continued permanence of the children, is the fact that at the onset of placement, the youngest child was significantly behind in his immunization records, the grandmother successfully got him up to date. In her testimony, the grandmother testified as follows:

4

50

A. Well, taking care of the four children, it requires 110 percent of me. So whether it's school, doctor's appointments, dentist appointment. Three of the children – well, four of them were in counseling. Three of them now remain in counseling, which is sometimes weekly, every other week. Numerous appointments, basketball game. We lost this one. But basketball games, events, activities. You know, to me, I can – that's a full-time job basically.

See *Transcript of Proceedings on February 21st 2014*, pg 57.

At another juncture in the case, the grandmother proffered testimony that was very indicative of the effects on ALL children of removal from the home.

Q:      ...what were they like when they first came to live with you three years ago?

A:      I – I think – I guess I would say they were a little afraid. They always kind of stayed together. Like they kind of needed each other. They was very interwoven with one another. They always kind of always kept a bag kind of packed not knowing what was going to happen and stuff and, you know, just always concerned about what's for dessert, what we're going to eat, you know, and different things like that.

So I think in the beginning, they might have been a little bit afraid, not sure. You know, but they felt happy to be with us because here and now we were getting things that were consistent and structure and attention, and – you know, so –

See *Transcript from Proceedings on February 21st 2014*, pg 58-9.

Of note, at the termination proceeding, the permanency caseworker testified as follows regarding the oldest child:

"A.R. was not very open with me, at that time. She was very upset about being in the foster care system. It took a while. She grew and opened up, and now she's actually on a good working relationship with me to a point where she'll discuss things. She is very comfortable in the home. She's actually told me she has come to a means of understanding that they just need to find somewhere to be, and she's fine with everything that the agency has been trying to do for her." See *Transcript of Proceedings from February 21st 2014*, pg. 22.

5

51

The Agency had discerned that the kinship-foster family was willing to be permanent resources for two of the four children, the daughter of the grandmother[4], was willing to be a permanent resource for two of the children. The kinship-foster family and the daughter's family lived a reasonable distance from each other, which would facilitate continued contact and interaction between the children and their siblings.

In discussion with the children regarding the suggested permanency options, the grandmother characterized their relative reactions:

> A.    All different reactions. [A.R.] just wants to be finished with Children and Youth. Adopt me. Do whatever you got to do. I just want to be finished. [E.R.] pretty much goes along with [A.R.]. She has been the mother for them when there wasn't really wasn't a mother figure there. So [A.R.] kind of feels like the three boys are her children. And I try to tell her, I'm the mother. One queen in the castle. It would be me. So she – they listen to her because that's who they're accustomed to. So [E.R.] will do what [A.R.] kind of say. They've been trained that way.
>
> Whereas, the two younger ones – [A.M.] is pretty independent. He's excited. He wants to go with [grandmother's daughter]. He wants to be with her. [I.R.] is just totally different. He's a little bit – he's not sure. They said we're going to mommy, they say we're going here, and he just kind of goes along with the crowd because of his age, I would say.

The grandmother testified that she believed that the children were "bonded" to the natural father, however, she testified that she believed that the children would not suffer irreparable harm from a severing of that bond.

The Court entered final orders of termination following the hearing, both parents appeal.

## Rule of Law

---

[4] The grandmother is actually the step-grandmother for the children, as she is married to the paternal grandfather. The step-grandmother's daughter (███████████) is the other permanent resource. She is not biological family, however, she has visited with the kinship-foster family at every holiday and the children are very familiar with the daughter's family. As such, it is this Court's opinion that the daughter's family is within the definition of a "kinship" placement.

6

52

The grounds for involuntary termination of parental rights are set forth in section 2511 of title 23 of the Pennsylvania Consolidated Statutes. Specifically sections (a)(1); (a)(2); (a)(5); and (a)(8) appear substantially as follows:

23 Pa.C.S.A. §2511(a)

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

...

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time; the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

...

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

See 23 Pa C.S.A. §2511.

Subsection (b) of the statute provides that: the court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

7

53

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

The term "needs and welfare" is a legal concept that "denotes certain minimum requirements that all children are entitled to—adequate housing, clothing, food and love." *In Re Coast*, 561 A.2d 762, 770 (Pa Super. 1989); *In re Adoption of Michael J.C.*, 473 A.2d 1021, 1029 (Pa. Super. 1984). "Thus, needs and welfare has both a tangible dimension, food, clothing and shelter, and an intangible dimension, parental love." *In re P.A.B.*, 570 A.2d 522, 525 (Pa. Super 1990); *In re J.W.*, 578 A.2d 952, 957 (Pa. Super. 1990). "It is universally agreed that the bond of *539 parental affection is unique and irreplaceable. When parents act in accordance with the natural bonds of parental affection, preservation of the parent-child bond is *prima-facie* in the best interest of the child and the state has no justification to terminate that bond." *In re J.W.*, 578 A.2d at 958. "If, as here, ties with natural parents are present and are an active force in the child's life, then needs and welfare becomes a concept that argues against termination, rather than fosters it." *In re P.A.B.*, 570 A.2d at 525. Moreover, pursuant to section 2511(a)(5), a court "must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial." *Id.*

Subsection (a)(8) sets a 12-month time frame for a parent to remedy the conditions which led to placement. Once the twelve month period has been established, the court must next determine whether the conditions which led to the child's placement continue to exist, despite the reasonable and good faith efforts of the Agency, supplied over a realistic timeframe. In order to terminate under section 2511(a)(8), the Court is not required to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of potential services. *See In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008). The Superior Court provided a detailed analysis of the termination ground listed at 23 Pa. C.S.A. §2511(a)(8) in the recent case of *In re T.M.T.*, 64 A.3d 1119 (Pa. Super. 2013).

The Supreme Court of Pennsylvania has held that incarceration, while not a litmus test, can be determinative in a termination proceeding. *See In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012). Each termination of parental rights case involving an incarcerated parent must be

8

54

evaluated on its own facts, bearing in mind that the child's needs for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what he is supposed to do in prison. See In re E.A.P., 944 A.2d 79 (Pa. Super. 2008). Incarceration does not relieve a parent of the duty to exercise reasonable firmness in maintaining a secure bond with the child. In the Interest of A.P., 693 A.2d 240 (Pa. Super. 1997). In termination of parental rights cases involving an incarcerated parent, a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment; moreover, the parent wishing to reestablish her parental responsibilities bears the burden of proof relative to post-abandonment contact. See In re C.L.G., 956 A.2d 999 (Pa. Super. 2008). When a parent is incarcerated, the focus in termination of parental rights action is on whether the parent utilized resources available while in prison to maintain a relationship with his child. In re B.N.M., 856 A.2d 847 (Pa. Super. 2004).

In a case where the incarcerated parent wrote letters, forwarded some child support, and sent gifts to the child, the Court found that these actions did not indicate a serious intent to re-cultivate a parent-child relationship and a willingness and capacity to undertake a parental role, and thus termination was appropriate. See e.g. In re D.J.S., 737 A.2d 283 (Pa. Super. 1999). The Court also found that the natural father in that case failed to utilize given resources and to take an affirmative approach to fulfill his parental duties and failed to follow through on inquires with prison officials and county social workers. See Id.

## Discussion:

As to Natural Father the decision reached has not been done so lightly. Natural Father indicates a willingness and a desire to reunify with his children. In addition, his children express a desire to reunify with him. He is appropriate with them during visits, and consistently strives to be a presence in their lives despite his incarceration. The caseworker testified that he does "everything he can" while incarcerated. Clearly we have a father who is striving to be a parent, despite being noticeably absent from the lives of his children.

However, Father has been incarcerated for over three years. His maximum sentence date is June 2014. He was not granted parole despite his requests and application for it. As noted above, the Court will not put a child's life on hold and await a parent who is fit, willing, and

9

55

able. Father would most likely not be fit and willing to provide care and control upon his release. As this Court is very familiar with the process by which released ex-convicts attempt to re-integrate and the hardships associated therewith, this Court is unwilling to force the children to wait any longer. Father is entirely appropriate with them, and it is likely that he loves them greatly, as they do him. However, this Court is encouraged by the prospect of adoption by the paternal grandfather and his step-daughter of the children. This kinship permanent placement will permit, albeit on Father's initiative only, continued contact between the children and their natural father. The fact that the words "termination" and "adoption" imply permanence and suggest a severance from a relationship with a natural parent has little effect in this case. This Court will not turn a blind eye to the practical considerations of the children's age and the fact that they acknowledge and love their father. There will be continued contact with the Natural Father and the children, and it will likely occur without this Court's intervention. Knowing, as we do, that that will be an easier process as the children are placed with kin makes this Court's decision that much more bearable.

As to the Natural Mother, the Court found aggravated circumstances as to her lack of involvement during the dependency case. It is severely disheartening to associate this situation with an absence of over six (6) months. This Court cannot fathom the lack of a desire to contact the children during that time. It, coupled with the troubling transiency, causes this Court to find that termination would certainly suit the best interests of the children as to Natural Mother. In addition, by virtue of the finding of aggravated circumstances, the natural mother has satisfied the statutory provisions which allow for termination when: there has been no contact between the parent and the child for a period of six (6) months; the conditions which led to placement continue to exist (lack of permanent living arrangements) and the fact that Mother has exhibited little interest in parenting her children until the eleventh hour.

## Conclusion

This Court hereby concludes that termination of the parental rights of both the Natural Father and the Natural Mother as to the minor children is required by the statutory provisions governing the same and would, undoubtedly serve the children's best interests.

BY THE COURT:

7-28-14

_____
Wm. Harvey Wiest, Judge

10

56

IN THE COURT OF COMMON PLEAS
OF NORTHUMBERLAND COUNTY, PA

IN RE: ADOPTION OF              :

         A. M. a minor child     :       ORPHAN'S COURT DIVISION

                                :       ADOPTEE # 48 of 2013

                                :

## OPINION PURSUANT TO Pa.R.A.P. 1925(a)

### Factual and Procedural Background

The family in the above-captioned case became involved with Northumberland County Children and Youth services in April of 2007, after allegations of an unsupervised child wandering around in the city of Sunbury. The matter was referred for a safety plan assessment, a plan was approved and the case was closed.

General Protective Services (GPS) became involved with the family again in 2010 responding to allegations of domestic violence, poor home conditions[1], and the possibility that the family would be evicted from their apartment. After the natural mother made new arrangements for a residence and successfully scheduled doctors' appointments for the children, the case was again closed.

More GPS referrals were received in late 2010 into early 2011 regarding the family's lack of basic utilities, natural mother's drug use, domestic violence, and potential eviction. There were also allegations of various unidentified individuals who frequented the home[2]. After investigation, the home was found to be without hot water and the natural mother admitted to having smoked marijuana. The family continued to remain involved with the GPS division of the Northumberland County Children and Youth Services, during their involvement through February 2011, the family struggled with domestic violence, truancy, lack of employment, danger of evictions, and related drug use. On February 18th 2011, the natural mother signed a Voluntary Entrustment Agreement, placing her children (including the above-captioned child) in

---

[1] Specifically, it was alleged that one minor child had several "flea bites."

[2] The Dependency petition in the case suggested that there were a "lot of 'Puerto Ricans' in an out of the home at all hours of the day and night."

1

57

the care and custody of Northumberland County Children and Youth Services who, in turn, placed the children in the home of the paternal grandparents, W██ ██ and T██ R██

The child was adjudicated Dependent on March 23rd 2011. The child was placed in foster care by the Agency. However, the placement was actually in the kinship home of V██ ███████[3].

On June 23rd 2013, Northumberland County Children and Youth Services (the Agency) filed a Motion for a Finding of Aggravated Circumstances alleging aggravated circumstances against the natural mother in that, while her identity or whereabouts were known, she failed to maintain substantial and continuing contact with the child for a period of six months.

On July 17th 2013, the Court found by clear and convincing evidence that the aggravated circumstance alleged existed as against the natural mother. The Court further ordered that NO efforts at reunification between the child and the Natural Mother need be made.

Consistent throughout the review period, that is the time during which the children were in care, the parents maintained little progress and efforts. Natural father was incarcerated (and continues to be) during the entire time period in which his children were in the Agency's custody. During his time of incarceration, the Natural father provided no documentation of any services, programs, or activities he was engaged in or completed. He did communicate with the children through letters. Natural mother, while ordered to participate in parenting classes, find gainful employment, and obtain housing, was minimally compliant. During the early part of the case, Natural Mother had visitation with the children, but from approximately mid-Summer of 2012 until sometime in early spring of 2013, she had no contact with the Agency and, to the Court's knowledge, did not contact the children.

On August 14th 2013, the Agency filed a Petition to Involuntarily Terminate the Parental Rights of Natural Mother and Natural Father. The children had spent thirty-six (36) months in the care and custody of the Agency, albeit in the home of their paternal grandmother and grandfather.

---

[3] The Order of Adjudication and Disposition indicates that placement was in Foster Care. The initial permanency review order indicated "Foster Care – Kinship."

On January 16th 2014, the Natural Mother filed a motion requesting the Court to direct the Agency to make a referral for a homestudy through the Interstate Compact. The homestudy would presumably have been performed on the maternal grandmother, who resided in New York. The Court denied the same.

On February 21st 2014 at the Termination Proceeding, the Natural Mother moved, in open court and on the record, for the relief requested in the motion. The Court denied the same, holding that the matter was better raised in proceedings before Dependency Court.

During the period of time in which the children were in care, the Natural Father, Nicolas Rivera, was incarcerated. During his incarceration, he wrote several letters which were received and reviewed by the caseworkers at the Agency, the caseworkers testified that they had written him back concerning the children. The Agency provided him with a copy of the Child's Permanency Plan, and never received any indication that the Natural Father did not understand or questioned the plan. Natural Father did sign the same on February 16th 2012.

The caseworker testified that as of April 2011, Natural Father was not engaged in any services. However, as of April 2013, the Natural father was "taking as many classes that w[ere] offered at SCI-Dallas. Due to each facility being different, they do not – they do not have the same things in each prison." See Transcript of Proceedings, February 21st 2014, pg 14. While in prison, Natural Father had regular visitation with the children. The children were transported by their grandmother, the kinship-foster parent. Natural Father was "very appropriate" during visitation with the children. See Transcript of Proceedings on February 21st 2014, pg 26. He sent the children pictures and letters, and kept in regular contact with the children. In some lengthy discussion, the caseworker was cross examined on the availability of services for the Natural Father while he was incarcerated. Specifically:

"Q: All right. Without looking at any orders, you don't know what you can say what he was court ordered to do, to participate in. Is that a fair statement?

A: That is fair. And due to being incarcerated, like I said earlier, not each facility has the same things. And it's tough for us to even know what is in each one because it changes from place to place or even month to month. So I think that was, in turn, why it was not spelled out as specific and said that when he would be released, he would need to let us know

3

59

specifically when he was out to become active with the full plan of what he needed to do."

See *Transcript of Proceedings from February 21st 2014*, pg 28-9.

Natural Father's maximum sentence date was June 13th 2014. According to the caseworker, the Natural Father was up for parole several times in during the three years the children were in placement, he was denied each time. The caseworker testified that it was her belief that he was denied by virtue of his behavior in prison. During the letter correspondence between the Natural Father and the caseworker, the Natural Father communicated his desire to be there for his children and his strong desire that the children not be adopted. The caseworker testified that she received letters from the Natural Father approximately monthly. She also testified that during her supervision of the visitation between the Natural Father and the children, Natural Father was entirely appropriate with the children, and the children were excited to see their father. Natural Father would mail some minor artwork, portraits, and other small gifts and keepsakes to the children whenever he could acquire the same.

The Natural Mother suffered from issues pertaining to domestic disputes and consistent transiency. What appears to be most disturbing is that Natural Mother apparently disappeared for some time and was unreachable by the Agency. Mother maintained limited visitation with her children. Specifically, between August of 2011 and Christmas of 2012, Natural Mother had no visits with her children. Regarding Mother's transiency, she lived in several towns and cities in Pennsylvania, and then moved to New York and New Jersey all during the time period that the children were in care. Mother made a great case at the termination hearing on February 21st 2014 regarding the fitness and availability of maternal grandmother as a resource home for the children. During the time of her request, Mother lived with the maternal grandmother in New York. Apparently, Mother had requested that the Agency permit the children to live with her in New York several times prior to Court on February 21st 2014.

Throughout the three years in placement, the kinship-foster family has provided for the needs of the children. An example of the level of devotion to the continued permanence of the children, is the fact that at the onset of placement, the youngest child was significantly behind in his immunization records, the grandmother successfully got him up to date. In her testimony, the grandmother testified as follows:

4

60

A. Well, taking care of the four children, it requires 110 percent of me. So whether it's school, doctor's appointments, dentist appointment. Three of the children – well, four of them were in counseling. Three of them now remain in counseling, which is sometimes weekly, every other week. Numerous appointments, basketball game. We lost this one. But basketball games, events, activities. You know, to me, I can – that's a full-time job basically.

See *Transcript of Proceedings on February 21st 2014*, pg 57.

At another juncture in the case, the grandmother proffered testimony that was very indicative of the effects on ALL children of removal from the home.

Q:     ...what were they like when they first came to live with you three years ago?

A:     I – I think – I guess I would say they were a little afraid. They always kind of stayed together. Like they kind of needed each other. They was very interwoven with one another. They always kind of always kept a bag kind of packed not knowing what was going to happen and stuff and, you know, just always concerned about what's for dessert, what we're going to eat, you know, and different things like that.

So I think in the beginning, they might have been a little bit afraid, not sure. You know, but they felt happy to be with us because here and now we were getting things that were consistent and structure and attention, and – you know, so –

See *Transcript from Proceedings on February 21st 2014*, pg 58-9.

Of note, at the termination proceeding, the permanency caseworker testified as follows regarding the oldest child:

"A.R. was not very open with me, at that time. She was very upset about being in the foster care system. It took a while. She grew and opened up, and now she's actually on a good working relationship with me to a point where she'll discuss things. She is very comfortable in the home. She's actually told me she has come to a means of understanding that they just need to find somewhere to be, and she's fine with everything that the agency has been trying to do for her." See *Transcript of Proceedings from February 21st 2014*, pg. 22.

5

61

The Agency had discerned that the kinship-foster family was willing to be permanent resources for two of the four children, the daughter of the grandmother[4], was willing to be a permanent resource for two of the children. The kinship-foster family and the daughter's family lived a reasonable distance from each other, which would facilitate continued contact and interaction between the children and their siblings.

In discussion with the children regarding the suggested permanency options, the grandmother characterized their relative reactions:

A. All different reactions. [A.R.] just wants to be finished with Children and Youth. Adopt me. Do whatever you got to do. I just want to be finished. [E.R.] pretty much goes along with [A.R.]. She has been the mother for them when there wasn't really wasn't a mother figure there. So [A.R.] kind of feels like the three boys are her children. And I try to tell her, I'm the mother. One queen in the castle. It would be me. So she – they listen to her because that's who they're accustomed to. So [E.R.] will do what [A.R.] kind of say. They've been trained that way.

Whereas, the two younger ones – [A.M.] is pretty independent. He's excited. He wants to go with [grandmother's daughter]. He wants to be with her. [I.R.] is just totally different. He's a little bit – he's not sure. They said we're going to mommy, they say we're going here, and he just kind of goes along with the crowd because of his age, I would say.

The grandmother testified that she believed that the children were "bonded" to the natural father, however, she testified that she believed that the children would not suffer irreparable harm from a severing of that bond.

The Court entered final orders of termination following the hearing, both parents appeal.

### Rule of Law

---

[4] The grandmother is actually the step-grandmother for the children, as she is married to the paternal grandfather. The step-grandmother's daughter (██████████) is the other permanent resource. She is not biological family, however, she has visited with the kinship-foster family at every holiday and the children are very familiar with the daughter's family. As such, it is this Court's opinion that the daughter's family is within the definition of a "kinship" placement.

The grounds for involuntary termination of parental rights are set forth in section 2511 of title 23 of the Pennsylvania Consolidated Statutes. Specifically sections (a)(1); (a)(2); (a)(5); and (a)(8) appear substantially as follows:

23 Pa.C.S.A. §2511(a)

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

...

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

...

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

See 23 Pa C.S.A. §2511.

Subsection (b) of the statute provides that: the court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

7

63

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

The term "needs and welfare" is a legal concept that "denotes certain minimum requirements that all children are entitled to—adequate housing, clothing, food and love." *In Re Coast*, 561 A.2d 762, 770 (Pa Super. 1989); *In re Adoption of Michael J.C.*, 473 A.2d 1021, 1029 (Pa. Super. 1984). "Thus, needs and welfare has both a tangible dimension, food, clothing and shelter, and an intangible dimension, parental love." *In re P.A.B.*, 570 A.2d 522, 525 (Pa. Super 1990); *In re J.W.*, 578 A.2d 952, 957 (Pa. Super. 1990). "It is universally agreed that the bond of *539 parental affection is unique and irreplaceable. When parents act in accordance with the natural bonds of parental affection, preservation of the parent-child bond is *prima-facie* in the best interest of the child and the state has no justification to terminate that bond." *In re J.W.*, 578 A.2d at 958. "If, as here, ties with natural parents are present and are an active force in the child's life, then needs and welfare becomes a concept that argues against termination, rather than fosters it." *In re P.A.B.*, 570 A.2d at 525. Moreover, pursuant to section 2511(a)(5), a court "must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial." *Id.*

Subsection (a)(8) sets a 12-month time frame for a parent to remedy the conditions which led to placement. Once the twelve month period has been established, the court must next determine whether the conditions which led to the child's placement continue to exist, despite the reasonable and good faith efforts of the Agency, supplied over a realistic timeframe. In order to terminate under section 2511(a)(8), the Court is not required to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of potential services. *See In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008). The Superior Court provided a detailed analysis of the termination ground listed at 23 Pa. C.S.A. §2511(a)(8) in the recent case of *In re T.M.T.*, 64 A.3d 1119 (Pa. Super. 2013).

The Supreme Court of Pennsylvania has held that incarceration, while not a litmus test, can be determinative in a termination proceeding. *See In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012). Each termination of parental rights case involving an incarcerated parent must be

8

64

evaluated on its own facts, bearing in mind that the child's needs for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what he is supposed to do in prison. *See In re E.A.P.*, 944 A.2d 79 (Pa. Super. 2008). Incarceration does not relieve a parent of the duty to exercise reasonable firmness in maintaining a secure bond with the child. *In the Interest of A.P.*, 693 A.2d 240 (Pa. Super. 1997). In termination of parental rights cases involving an incarcerated parent, a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment; moreover, the parent wishing to reestablish her parental responsibilities bears the burden of proof relative to post-abandonment contact. *See In re C.L.G.*, 956 A.2d 999 (Pa. Super. 2008). When a parent is incarcerated, the focus in termination of parental rights action is on whether the parent utilized resources available while in prison to maintain a relationship with his child. *In re B.N.M.*, 856 A.2d 847 (Pa. Super. 2004).

In a case where the incarcerated parent wrote letters, forwarded some child support, and sent gifts to the child, the Court found that these actions did not indicate a serious intent to re-cultivate a parent-child relationship and a willingness and capacity to undertake a parental role, and thus termination was appropriate. *See e.g. In re D.J.S.*, 737 A.2d 283 (Pa. Super. 1999). The Court also found that the natural father in that case failed to utilize given resources and to take an affirmative approach to fulfill his parental duties and failed to follow through on inquires with prison officials and county social workers. *See Id.*

## Discussion:

As to Natural Father the decision reached has not been done so lightly. Natural Father indicates a willingness and a desire to reunify with his children. In addition, his children express a desire to reunify with him. He is appropriate with them during visits, and consistently strives to be a presence in their lives despite his incarceration. The caseworker testified that he does "everything he can" while incarcerated. Clearly we have a father who is striving to be a parent, despite being noticeably absent from the lives of his children.

However, Father has been incarcerated for over three years. His maximum sentence date is June 2014. He was not granted parole despite his requests and application for it. As noted above, the Court will not put a child's life on hold and await a parent who is fit, willing, and

9

able. Father would most likely not be fit and willing to provide care and control upon his release. As this Court is very familiar with the process by which released ex-convicts attempt to re-integrate and the hardships associated therewith, this Court is unwilling to force the children to wait any longer. Father is entirely appropriate with them, and it is likely that he loves them greatly, as they do him. However, this Court is encouraged by the prospect of adoption by the paternal grandfather and his step-daughter of the children. This kinship permanent placement will permit, albeit on Father's initiative only, continued contact between the children and their natural father. The fact that the words "termination" and "adoption" imply permanence and suggest a severance from a relationship with a natural parent has little effect in this case. This Court will not turn a blind eye to the practical considerations of the children's age and the fact that they acknowledge and love their father. There will be continued contact with the Natural Father and the children, and it will likely occur without this Court's intervention. Knowing, as we do, that that will be an easier process as the children are placed with kin makes this Court's decision that much more bearable.

As to the Natural Mother, the Court found aggravated circumstances as to her lack of involvement during the dependency case. It is severely disheartening to associate this situation with an absence of over six (6) months. This Court cannot fathom the lack of a desire to contact the children during that time. It, coupled with the troubling transiency, causes this Court to find that termination would certainly suit the best interests of the children as to Natural Mother. In addition, by virtue of the finding of aggravated circumstances, the natural mother has satisfied the statutory provisions which allow for termination when: there has been no contact between the parent and the child for a period of six (6) months; the conditions which led to placement continue to exist (lack of permanent living arrangements) and the fact that Mother has exhibited little interest in parenting her children until the eleventh hour.

## Conclusion

This Court hereby concludes that termination of the parental rights of both the Natural Father and the Natural Mother as to the minor children is required by the statutory provisions governing the same and would, undoubtedly serve the children's best interests.

BY THE COURT:

Wm. Harvey Wiest, Judge

4-28-14

10

66